```
UNITED STATES DISTRICT COURT              FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

SAROJ C. PARIKH,

                 Plaintiff,                                MEMORANDUM
                                                           AND ORDER
                                                           07-CV-3742 (JG)
         -against-

MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

                 Defendant.
-----------------------------------------------------------x
A P P E A R A N C E S :

         BINDER AND BINDER, P.C.
             215 Park Avenue South, 6th Floor
             New York, NY 10003
         By: Charles E. Binder
             Kristine Kwon
             Attorneys for Plaintiff

         BENTON J. CAMPBELL
             United States Attorney
             Eastern District of New York
             271 Cadman Plaza East
             Brooklyn, NY 11201
         By: Steven M. Warshawsky
             Attorney for Defendant
```

JOHN GLEESON, United States District Judge:

      Saroj C. Parikh brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security determining that she is not entitled to disability insurance benefits under the Social Security Act. Both parties cross-move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons stated below, Parikh's motion is granted and the Commissioner's motion is denied. The case is remanded to the Commissioner for a new hearing.

BACKGROUND

A.    *Parikh's Self-Description*[1]

Parikh was born in India on October 5, 1951, R. 54, 172, where she earned a college degree prior to moving to the United States in 1981. *Id.* at 172-73. She worked as a clerk for the New York State Comptroller's Office from January of 1987 until March 8, 2005, *id.* at 60, 161, 170, 177-78.[2] On January 6, 2005, Parikh's supervisor humiliated her and became overly critical of her work, *id.* at 171-72, leading her to become depressed and to quit her job on March 8, 2005. *Id.* at 108, 172-73.

Parikh claims that she suffers from depression, insomnia and obsessive-compulsive traits that make her restless and impair her memory. *Id.* at 162. She feels that she cannot work at any job because her depression makes her afraid of others and unable to concentrate. *Id.* at 170-72. She attends monthly individual and group therapy. *Id.* at 180-81.

Parikh lives with her son, who does most of the housework such as cleaning and laundry. *Id.* at 163, 165.[3] While her son does the grocery shopping, Parikh prepares simple meals by microwaving food or else having it delivered. *Id.* at 163, 165. Her son has a mental illness for which he takes medication,[4] and Parikh financially supports him while he is studying. *Id.* at 174.

---

[1] The facts in this section are taken primarily from Parikh's disability benefit eligibility hearing before Administrative Law Judge Brian W. Lemoine on January 31, 2007. R. at 158-81.

[2] Parikh was unable to explain her job duties in detail at her benefit eligibility hearing. R. at 170-71.

[3] While the transcript indicates that Parikh said at her eligibility hearing that her son was 13 years old, *id.* at 163, she also stated that he had a BS in accounting, *id.* at 174, and that she has lived with him for over 20 years, *id.* at 173. Given that no other individuals present at the hearing express on the record any awareness of this contradiction, and that she is asked if her son is employed, *id.*, it is possible that his age was improperly transcribed as "13" when in fact she said "30" or something which sounded similar.

[4] Parikh did not know the name of her son's mental illness. *Id.* at 174.

Parikh pays bills with money that her sister and brother-in-law provide. *Id.* at 163-64. She does not travel alone because she is afraid of getting lost. *Id.* at 166-67. Parikh typically wakes up between 10 and 12 A.M. and spends the day resting due to her depression. *Id.* at 167. She does not socialize because she becomes aggravated and does not want to reveal that she is not working. *Id.* at 168-69.

B. *Medical Evidence*

1. *Dr. Moy, Parikh's Treating Osteopathic Family Practitioner*

On March 9, 2005, Dr. Michael Moy, an osteopathic family practitioner, began treating Parikh. R. at 107. He examined her on March 11, 2005, when she complained of migraine headaches, anxiety, and insomnia induced by office noise pollution. *Id.* She reported that her symptoms began on January 6, 2005, *id.*, and reported no previous psychiatric history or history of alcohol or drug abuse, *id*. Dr. Moy diagnosed her with headaches and insomnia, opined that she was totally disabled, and recommended that she rest at home, be accompanied when going outside, and visit a neurologist, psychiatrist, and cardiologist. *Id.* He examined her on April 12, 2005, May 5, 2005, and June 13, 2005, and on each occasion she reported the same symptoms and he reached the same diagnosis and conclusion as to disability. *Id.* at 104-06.

Dr. Moy examined Parikh again on June 25, 2005. He observed that she was appropriately dressed and groomed and able to speak coherently, but was apprehensive, restless, depressed, anxious, and tense. *Id.* at 102. She stated that she was having paranoid thoughts and occasional feelings of worthlessness and was obsessed with thoughts of humiliation and unfair treatment at work. *Id.* While she was alert and oriented as to person, place and time, and her memory was grossly intact, her attention and concentration were limited when tested by

3

subtraction and also in general conversation. *Id.* Dr. Moy diagnosed her with depressive disorder, with a global assessment of functioning ("GAF") of 54. *Id.*[5] He suggested continuing medications[6] and avoiding environments which exacerbated her symptoms, such as the workplace. *Id.* at 103. He considered her prognosis "fair if proper treatment is provided." *Id.*

    2.    *Dr. Shpitalnik, Parikh's Treating Psychiatrist*

Dr. Vilor Shpitalnik, a psychiatrist, evaluated Parikh on May 2, 2005, and noted that she complained of a "[d]epressed [m]ood most of the day almost every day, headaches, anxiety, insomnia, lack of energy, obsessive thoughts about the incident [where she was humiliated by her supervisor], feelings of hopelessness, low self-esteem, thoughts of worthlessness of life." R. at 108. He found her facial expression to be sad, her mood to be depressed, anxious and tense, and her affect somewhat constricted. *Id.* However, he noted that she was appropriately dressed and groomed and did not find any evidence of thought process disorder. *Id.* He did note that her attention and concentration span was somewhat limited. *Id.* at 109. Dr. Shpitalnik diagnosed Parikh with major depressive disorder and assessed her GAF at 50.[7] *Id.* Dr. Shpitalnik prescribed Zoloft and Sonata for Parikh. *Id.*

On July 18, 2005, Dr. Shpitalnik wrote a letter indicating that he had been treating Parikh since May 2, 2005, restating her symptoms and his diagnosis of major depressive disorder and opining that Parikh was "unable to function in her work setting" for at least three months. *Id.* at 130. On April 3, 2006, Dr. Shpitalnik noted that Parikh had not improved and was "still

---

[5] A GAF between 51 and 60 reflects moderate symptoms or moderate difficulty in social, occupational, or school functioning. Am. Psych. Assoc., *Diagnostic & Statistical Manual of Mental Disorders, Fourth Edition: DSM-IV* 32 (1994) [hereinafter *DSM-IV*].

[6] Although Dr. Moy's report does not specify the medications to be continued, they were presumably the Zoloft and Sonata Dr. Shpitalnik prescribed on May 2, 2005, as noted *infra*.

[7] A GAF between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV*, *supra* note 5, at 32.

experiencing depression, anxiety, insomnia, and low self-esteem." *Id.* at 132. He also reported that she experienced occasional dizzy spells and episodes of physical weakness. *Id.* Dr. Shpitalnik observed her to have a sad facial expression and a depressed, anxious and tense mood, noted that "she easily breaks down in crying spells," and found her to have limited concentration and attention. *Id.* at 132-33. He diagnosed her with major depressive disorder, and opined that she was totally disabled. *Id.* at 133.

On December 4, 2006, Dr. Shpitalnik completed a psychological impairment questionnaire on the basis of his monthly observations of Parikh, including an observation that day. *Id.* at 148. He found Parikh suffered from appetite disturbance, sleep disturbance, mood disturbance, emotional lability, anhedonia, difficulty concentrating, social withdrawal, decreased energy, intrusive recollections of her humiliation at work, and generalized persistent anxiety. *Id.* at 149. He diagnosed her with major depressive disorder with a GAF of 50. *Id.* at 148. He found that she was "markedly limited," signifying an impairment that "effectively precludes the individual from performing the activity in a meaningful manner," in the ability to "carry out detailed instructions"; to "maintain attention and concentration for extended periods"; to "sustain ordinary routine without supervision"; to "work in coordination with or proximity to others without being distracted by them"; to "get along with co-workers or peers without distracting them or exhibiting behavioral extremes"; to "maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness"; to "respond appropriately to changes in the work setting"; to "be aware of normal hazards and take appropriate precautions"; and to "travel to unfamiliar places or use public transportation." *Id.* at 151-53. Dr. Shpitalnik found that Parikh would be incapable of tolerating even a low-stress work environment. *Id.* at 154.

3. *Dr. Broska, The Social Security Administration's Consulting Psychologist*

On September 8, 2006, Dr. Arlene Broska evaluated Parikh for the Social Security Administration. R. at 143-47. She found that Parikh was appropriately dressed and exhibited good concentration and attention and adequate speech and language skills, and that she appeared cooperative, friendly, relaxed, and comfortable. *Id.* at 144. However, she noted that Parikh appeared to be mildly depressed, *id.*, and exhibited a full scale IQ of 64, which is "in the mild mentally impaired range of intellectual functioning," *id.* at 145. Dr. Broska noted that Parikh's performance scale IQ of 69 was higher than her verbal scale IQ of 66. *Id.* Dr. Broska took this fact to be indicative of generalized cognitive dysfunction rather than depression, because performance scale activities typically are more significantly impacted by depression than verbal scale activities. *Id.*

Dr. Broska found the results of her evaluation to be consistent with cognitive and psychiatric problems, which might significantly interfere with Parikh's ability to function on a daily basis. *Id.* at 146. She indicated that Parikh could perform simple tasks independently, but could not maintain attention and concentration, learn new tasks, or maintain a regular schedule, and was not relating adequately with others or appropriately dealing with stress. *Id.* at 145.

Dr. Broska diagnosed Parikh with major depressive disorder (apparently due to her prior history, as the diagnosis reads, "Major depressive disorder, by history") and cognitive disorder, and opined that Parikh would need assistance managing funds due to these conditions. *Id.*

4. *Dr. Lopez, The State Agency Review Psychologist*

On July 29, 2005, Dr. Robert Lopez, Ph.D., a state agency review psychologist, assessed Parikh's residual functional capacity based on his review of the record of medical evidence available at that time and his interviews with Dr. Moy and Dr. Shpitalnik the day before. R. at 110-128. Dr. Moy told Dr. Lopez that Parikh had collapsed on July 7, 2005, and he had referred her for a cardiological workup. *Id.* at 111. Dr. Moy also said that as far as he could tell, Parikh was no longer paranoid, but that Dr. Shpitalnik would have more information. *Id.* Dr. Shpitalnik told Dr. Lopez that Parikh was somewhat improved but still depressed and anxious, which continued to impose slight limits on her attention and concentration. *Id.* at 110. Dr. Shpitalnik opined that if she continued to comply with treatment she "should be able to perform" substantial gainful activity by February of 2006. *Id.*

Dr. Lopez concluded that Parikh was moderately limited in her ability to "understand and remember detailed instructions"; to "carry out detailed instructions"; to "maintain attention and concentration for extended periods"; to "interact appropriately with the general public"; and to "set realistic goals or make plans independently of others." *Id.* at 126-27. He concluded that she was not capable of following supervision, relating appropriately to coworkers, or performing substantial gainful activity at that time, but that by February of 2006 she would be able to perform jobs not involving a high degree of stress. *Id.* at 128.

C. *Procedural History*

On June 15, 2005, Parikh applied for disability insurance benefits based on headaches, anxiety, and major depression. R. 54-59. She initially claimed that the onset of her disability occurred on February 1, 2005, *id.* at 54, 59, but at the hearing she revised this date to

7

March 8, 2005. Her claim was denied by the Social Security Administration on August 5, 2005. Parikh requested a hearing before an Administrative Law Judge ("ALJ"), which was conducted on January 31, 2007. *Id.* at 158-81. ALJ Brian W. Lemoine conducted the hearing and, on February 7, 2007, rejected Parikh's disability claim by written decision.

ALJ Lemoine's decision found that Parikh had not engaged in substantial gainful activity since the alleged onset date of March 8, 2005, and that she was covered under the Social Security Act. *Id.* at 15. He found that Parikh had major depressive disorder, which was a severe impairment for the purposes of 20 C.F.R. § 404.1520(a)(4)(ii), (c). *Id.* ALJ Lemoine then determined that her disorder was not an impairment listed in the Listings of Impairments contained in Appendix 1 to Subpart P of Part 404 of the Social Security Administration's regulations, 20 C.F.R. pt. 404, subpt. P, app. 1. R. 15-16. He found that her depression limited her to the performance of simple and routine tasks, but imposed no other limitations.

The ALJ discredited Dr. Broska's low IQ scores, finding them inconsistent with her college education and history of employment. *Id.* at 16. He also stated that Parikh testified that she "lives with her disabled son, whom she cares for; she takes care of her own apartment and manages her own money independently" and cited this as reason to reject Dr. Broska's findings of low IQ. *Id.* He also discredited Dr. Shpitalnik's assessments of marked limitations in various areas, finding that they were not confirmed by the results of her mental status examinations and not supported by "adequate objective findings" but only by "unquestioning acceptance of [Parikh's] self-reported symptoms, which are not credible." *Id.* ALJ Lemoine found instead that her limitations consisted of "mild restriction in activities of daily living; mild

limitations in social functioning; moderate limitations in concentration, persistence and pace; and no episodes of decompensation."[8] *Id.* at 16.

ALJ Lemoine discredited Parikh's testimony for the following reasons: (1) she never required inpatient treatment and sees Dr. Shpitalnik monthly, whereas he originally recommended twice-monthly sessions; (2) she testified that her medicine makes her drowsy and gives her a poor appetite but her physicians' reports do not reflect such complaints; (3) "there was no obvious evidence of any significantly limiting mental or emotional problem demonstrated during the course of the hearing"; (4) Parikh testified, under the ALJ's characterization, that she "manages her household funds; receives money from relatives, pays all bills and has no problems taking care of her apartment"; and (5) she had pending applications for state disability pensions, giving her no incentive to seek work. *Id.* at 17. He further opined that Parikh's apprehension about being humiliated at work would dissipate if she worked at a different job. *Id.* at 18. ALJ Lemoine concluded that she had the ability to perform simple, routine tasks, and that there are a substantial number of jobs that she could perform. *Id.* at 19.

ALJ Lemoine's decision became the final order of the Commissioner when the Appeals Council denied her request for review. *Id.* at 4-5.

DISCUSSION

A.   *Standard of Review*

Under 42 U.S.C. § 405(g), I review the Commissioner's decision to determine whether it was "supported by substantial evidence in the record as a whole or [was] based upon an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (internal

---
[8] Decompensation in this context refers to the "appearance or exacerbation of a mental disorder due to failure of defense mechanisms." WebMD, *Stedman's Medical Dictionary* (28th ed. 2006), http://dictionary.webmd.com/terms/decompensation.xml.

quotation marks omitted) (citing *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)). In order to decide whether the Commissioner's conclusions are supported by substantial evidence, a reviewing court must "first satisfy [itself] that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purpose of the Act.'" *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir 1982) (quoting *Gold v. Sec'y of HEW*, 463 F.2d 38, 43 (2d Cir. 1972)).

Under the Social Security Act, Parikh is entitled to disability insurance benefits if, "by reason of [a] medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," § 423(d)(2)(A). The Commissioner decides whether the claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1527(e)(1).

The Social Security Administration's regulations break down the inquiry into a five-step process:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the

> claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal quotation marks and alterations omitted) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also* 20 C.F.R. § 404.1520 (setting forth this process).

B.  *The ALJ's Evaluation of the Medical Evidence*

    1.  *The ALJ's Decision to Disregard Dr. Shpitalnik's Findings*

Parikh argues that the ALJ erroneously failed to accord controlling weight to the findings of Dr. Shpitalnik, her treating mental health practitioner. While the final determination as to disability rests with the Commissioner, 20 C.F.R. § 404.1527(a)(2), a treating physician's opinion about a claimant's impairment is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding these regulations). When the Commissioner does not give a treating physician's opinion controlling weight, the weight given to that opinion must be determined by "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal*, 134 F.3d at 503 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). The Commissioner must set forth "good reasons" for failing to accord the opinions of a treating physician controlling weight. *See, e.g.*, *Halloran v. Barnhart*, 362 F.3d 28,

32-33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians [sic] opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

The ALJ discredited Dr. Shpitalnik's reports in their entirety, claiming that they were "not supported by adequate objective findings," but rather were "based on unquestioning acceptance of [Parikh's] self-reported symptoms, which are not credible." R. at 16; *see also id.* at 18 ("Dr. Shpitalnik's reports lack supportive objective findings, as he seemed to unquestioningly accept the claimant's self-reported symptoms, which are not credible for the reasons explained above."). However, Dr. Shpitalnik's mental status evaluations on May 2, 2005 and April 3, 2006 record his observation of an apprehensive appearance; a sad facial expression; a depressed anxious and tense mood; constricted affect; somewhat limited attention and concentration; and a labile affect including crying spells. *Id.* at 108-09, 132-33. The ALJ took these findings to indicate that Parikh's condition was insufficiently severe, *id.* at 16, and concluded that Dr. Shpitalnik's findings of "marked" limitations in Parikh's functioning were "based on unquestioning acceptance of [her] self-reported symptoms," *id.* This second-guessing of Dr. Shpitalnik's diagnosis is inconsistent with the ALJ's obligation to give controlling weight to the opinions of her treating physician.

The ALJ had no basis to conclude that Dr. Shpitalnik merely accepted Parikh's self-report without question. Although Dr. Shpitalnik's conclusions went beyond the actual behaviors he recorded observing, they were certainly consistent with his observations. There is no requirement that treating physicians' opinions be supported by *objective* evidence; instead the

12

requirement is that the opinion be supported by "acceptable clinical and laboratory diagnostic techniques." § 404.1527(d)(2); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) ("As a general matter, 'objective' findings are not required in order to find that an applicant is disabled."). Interviewing a patient and assessing her subjective self-reported symptoms can be an acceptable clinical diagnostic technique when the condition complained of involves a substantial subjective component. *See Green-Younger*, 335 F.3d at 107 ("The fact that Dr. Helfand also relied on Green-Younger's subjective complaints hardly undermines his opinion as to her functional limitations, as '[a] patient's report of complaints, or history, is an essential diagnostic tool.'" (quoting *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997)). There is no indication that Dr. Shpitalnik's incorporation of what were apparently some self-reported symptoms into his findings was not done using acceptable clinical diagnostic techniques.

However, while Dr. Shpitalnik's findings may have been based on acceptable clinical diagnostic techniques, it is not entirely clear that this is the case, as the findings of marked limitations in numerous areas do seem more severe than the observations he made during his mental status examinations. To the extent that the ALJ suspected that Dr. Shpitalnik diverged from acceptable clinical diagnostic techniques in finding that Parikh was markedly limited in many areas, the ALJ had a duty to expand the record and determine whether or not Dr. Shpitalnik simply uncritically accepted Parikh's claims. *See, e.g.*, *Rivas v. Barnhart*, No. 01-CV-3672 (RWS), 2005 WL 183139, at *23 (S.D.N.Y. Jan. 27, 2005) ("[W]here, as here, an ALJ concludes that the opinions or reports rendered by a claimant's treating physicians lack objective clinical findings, she may not reject the opinion as unsupported by objective medical evidence

without taking affirmative steps to develop the record in this regard. In other words, an ALJ has an affirmative duty to seek amplification of an otherwise favorable treating physician report where the report is believed to be insufficiently explained or lacking in support." (citing cases)). Accordingly, unless Dr. Shpitalnik's findings may be otherwise discredited as inconsistent with the record as a whole, § 404.1527(d)(2), a remand is warranted by the ALJ's failure to comply with the treating physician rule by expanding the record.

The ALJ did not explicitly conclude that Dr. Shpitalnik's findings of marked limitations are inconsistent with the record as a whole, but he appears to have implied this by noting that Dr. Broska's finding that Parikh can perform simple tasks *is* consistent with the record as a whole. R. 18.[9] I am not persuaded. The ALJ plucked this one finding out of Dr. Broska's assessment, entirely ignoring Dr. Broska's other findings that Parikh was "not able to maintain attention and concentration, learn new tasks, or maintain a regular schedule," *id.* at 145, was "not relating adequately with others or appropriately dealing with stress," *id.*, and would even need assistance in managing funds awarded her due to her "cognitive difficulties and psychiatric symptoms," *id.* at 146.

To the extent the ALJ may have intended his negative analysis of Parikh's credibility to support the conclusion that Dr. Shpitalnik's opinion was inconsistent with the record as a whole, I disagree. The ALJ found that Parikh's daily activities suggested that she is not disabled, claiming that Parikh "cares for" her "disabled" son and "takes care of her apartment

---

[9] The ALJ also noted that Dr. Shpitalnik and Dr. Lopez concluded in July of 2005 that Parikh was incapable of working but opined that she would be able to return to work by February of 2006, presumably to contrast it with Dr. Shpitalnik's April 2006 finding that Parikh could not return to work. *Id.* I am not sure what significance this is supposed to have in light of the fact, as the ALJ noted, that the ultimate determination of disability is made by the Commissioner. *Id.* In any event, I do not see how the prediction that Parikh's condition would improve in half a year trumps, or even significantly conflicts with, the finding that she did not improve as expected. Thus, to the degree that the ALJ intended this prediction that Parikh would improve to render Dr. Shpitalnik's findings of her limitations inconsistent with the record as a whole, I am not persuaded.

and manages her own money independently." *Id.* at 16; *see also id.* at 17 ("[D]espite her allegations of severe depression, the claimant testified that she still manages her household funds; receives money from relatives, pays all bills and has no problems taking care of her apartment."). This is a questionable characterization of Parikh's testimony. While Parikh did say that she "can do the little housework," *id.* at 163, she also stated that her son performs most of the household cleaning, laundry, and grocery shopping, while she tries to help out, and cooks and microwaves simple meals. *Id.* at 163-65. While she did say that she financially supports her son, *id.* at 173-74, she also said that she writes checks to pay bills with money her relatives send her, *id.* at 163-64, which is somewhat different than the ALJ's claim that she "manages her own money independently," *id.* at 16.

The ALJ also mentioned several other reasons to disregard Parikh's testimony, but they do not render Dr. Shpitalnik's findings of marked limitations inconsistent with the record as a whole. He noted that Parikh has never required inpatient psychiatric hospitalization and that she initially saw Dr. Shpitalnik twice a month but now sees him only once per month. *Id.* at 17. Although the ALJ appears to have considered these facts relevant to the severity of Parikh's condition, nothing in the record indicates that they are inconsistent either with Parikh's self-described symptoms or with Dr. Shpitalnik's findings of marked limitations. *See, e.g.*, *Shaw v. Chater*, 221 F.3d 126, 134-35 (2d Cir 2000) ("[T]he ALJ and trial court imposed their notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered. This is not the overwhelmingly compelling type of critique that would permit the Commissioner to overcome an otherwise valid medical opinion."). The ALJ also relied on the fact that Parikh "related well to the Administrative Law Judge and to her representative at the

hearing and there was no obvious evidence of any significantly limiting mental or emotional problem demonstrated during the course of the hearing," R. 17, and noted his conclusion that Parikh's fear of humiliation would apply only if she returned to her previous workplace, *id.* at 18. The ALJ's attempt to substitute his medical judgment for that of Parikh's treating physician does not render Dr. Shpitalnik's conclusions inconsistent with the record. *See, e.g.*, *Shaw*, 221 F.3d at 134 ("Neither the trial judge no the ALJ is permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion."); *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("In analyzing a treating physician's report, 'the ALJ cannot arbitrarily substitute his own opinion for competent medical opinion.'" (quoting *McBrayer v. Sec'y for Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983))).[10]

Accordingly, Dr. Shpitalnik's findings were not inconsistent with the record as a whole. Thus, the ALJ had a duty to expand the record to determine whether Dr. Shpitalnik's findings were in fact based on acceptable clinical diagnostic techniques so that he could determine whether to accord the opinions controlling weight. As the ALJ failed to provide "good reasons" for disregarding the opinions of a treating physician, remand is warranted. *Halloran*, 362 F.3d at 32-33.

---

[10] I mention for completeness two further adverse credibility findings with scant relevance to whether Dr. Shpitalnik's findings were inconsistent with the record as a whole. The ALJ noted that Parikh reported side effects of medications at the hearings but that her physicians did not make any notations that she was experiencing side effects. R. 17. The ALJ also, curiously, took the fact that Parikh had a pending application for a state disability pension to impeach her credibility by giving her a disincentive to work while waiting for the pension to be approved. *Id.* I am at a loss to understand why Parikh's situation is different in this regard than the situation of any claimant of Social Security disability benefits, but whatever probative value either of these findings may have, they have little bearing on whether Dr. Shpitalnik's findings are inconsistent with the record as a whole.

2.  *The ALJ's Failure to Address Dr. Moy's Findings*

Dr. Moy treated Parikh at the onset of her alleged disability and opined that she was totally disabled by depressive disorder. R. 102-07. After summarizing Dr. Moy's findings in the beginning of his decision, *id.* at 14-15, the ALJ did not expressly address these findings either to credit or reject them. The ALJ may not simply ignore evidence of disability from a treating source. *See, e.g.*, *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) ("The ALJ must consider the entire record in accordance with his duty under 20 C.F.R. [§] 404.1520(3). It is not proper for the ALJ to simply pick and choose from the transcript only such evidence as supports his determination, without affording consideration to evidence supporting the plaintiff's claims. It is grounds for remand for the ALJ to ignore parts of the record that are probative of the plaintiff's disability claim."); *see also Lopez v. Sec'y of Dep't of Health & Human Servs.*, 728 F.2d 148, 150-51 (2d Cir. 1984) ("We have remanded cases when it appears that the ALJ has failed to consider relevant and probative evidence which is available to him."). Accordingly, the ALJ's failure to address Dr. Moy's opinion that Parikh was totally disabled is an additional basis for remand.

3.  *The ALJ's Characterization of Dr. Broska's Findings*

As discussed above, the ALJ's analysis of Dr. Broska's testimony is somewhat selective. Parikh appears to argue that this is an independent basis for remand. See Pl.'s Mem. 15. Given that Dr. Broska is a consulting, and not treating, physician, I do not see this degree of selectivity alone as an independent basis for remanding the claim. *Cf. McKissick v. Barnhart*, No. 01-CV-1550 (JG), 2002 WL 31409933, at *12-*13 (E.D.N.Y. Sept. 30, 2002) (finding that the ALJ's gross mischaracterization of a treating physician's findings justifies remand).

17

However, I do not find Dr. Broska's assessment, when seen in its entirety, to significantly undermine Dr. Shpitalnik's findings that Parikh was markedly limited in several areas so as to relieve the ALJ of her duty to accord his findings controlling weight.

C.   *The ALJ's Decision to Discredit Parikh's Testimony*

As discussed above, the ALJ assigned little weight to Parikh's testimony regarding her limitations. Parikh argues that this failure to credit her testimony was not supported by substantial evidence. The conclusion that the case must be remanded, coupled with my finding below that disability was not proved so persuasively that the case must be remanded for calculation of benefits, makes it unnecessary for me to decide this claim.[11]

D.   *Scope of the Remand*

As discussed in Section B.1, above, it is not entirely clear that Dr. Shpitalnik's opinions were entitled to controlling weight under the treating physician rule. For similar reasons, it is also not entirely clear whether Dr. Moy's opinions will be entitled to controlling weight under the treating physician rule. Therefore, it would be inappropriate to remand solely for calculation of benefits. *See, e.g.*, *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) ("When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the Secretary for further development of the evidence. . . . On the other hand, we have reversed and ordered that benefits be paid when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose.").

---

[11] Of course, in Section B.1, above, I have considered the ALJ's treatment of Parikh's testimony to the extent necessary to determine whether Dr. Shpitalnik's opinions could be set aside as inconsistent with the record as a whole.

So ordered.

JOHN GLEESON, U.S.D.J.

Dated: March 2, 2008
      Brooklyn, New York